**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No.: 20-10794-lgb |
| | ) | |
| VOJISLAV SESUM, | ) | Chapter 7 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| SQUAREPOINT OPS, LLC, | ) | Adv. Pro. No.: 20-01090-lgb |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VOJISLAV SESUM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

### <u>APPEARANCES</u>

Lazare Potter Giacovas & Moyle
747 Third Avenue, 16th Floor
New York, NY 10017
By:    Robert A. Giacovas, Esq.
       Lainie E. Cohen, Esq.
       Michael T. Conway, Esq.
*Attorneys for Squarepoint Ops, LLC*

Whitman Breed Abbott & Morgan LLC
500 West Putnam Avenue
Greenwich, CT 06830
By:    James C. Riley, Esq.

Neubert, Pepe & Monteith, P.C.
195 Church Street
New Haven, CT 06510
By:    Douglas S. Skalka, Esq.
*Attorneys for Vojislav Sesum*

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

On May 22, 2020, Squarepoint Ops, LLC commenced an adversary proceeding against the Debtor, Vojislav Sesum, seeking a determination that the debt that Sesum owes Squarepoint under the Arbitration Award (as defined below) is not dischargeable pursuant to sections 523(a)(4) and/or 523(a)(6) of the United States Bankruptcy Code. For the reasons set forth in this decision, the Court finds that the debt is dischargeable. Additionally, the Court finds that the injunction included in the Arbitration Award does not constitute a "claim" and therefore is not dischargeable.

## I.    PROCEDURAL BACKGROUND

### A.  Background

Squarepoint Ops, LLC ("Squarepoint" or "Plaintiff") is a "global asset management firm that utilizes a diversified portfolio of systematic and quantitative strategies that are developed with highly confidential and proprietary information." ECF No. 1 at 2; ECF No. 33 at 1. Vojislav Sesum ("Sesum" or "Debtor" or "Defendant") was employed as a quantitative researcher at Squarepoint between September 1, 2015 and March 5, 2018. ECF No. 33 at 3. In his role as a quantitative researcher, Sesum "developed algorithms and performed research for the purpose of creating business strategies for investments in equities." *Id*. After resigning from Squarepoint, Sesum joined Millennium Management, Inc. ("Millennium") in June 2018 as a portfolio manager. ECF No. 34 at ¶¶ 3, 31.

Following Sesum's resignation, Squarepoint undertook a "routine investigation . . . of the work that Sesum had been conducting" to "ensure that no IP had been removed." ECF No. 1 at ¶ 66. Based on its findings, Squarepoint claims that "[d]uring his employ as a quantitative researcher for Squarepoint, Sesum improperly accessed, collected, and downloaded proprietary data (including source code) for some of Squarepoint's most valuable quantitative trading strategies and then surreptitiously created a successful trading strategy that he kept hidden and disguised in his personal directory from Squarepoint." ECF No. 33 at 1. Squarepoint adds that the "trading strategy that Sesum created belonged to Squarepoint" and he "intentionally hid the strategy from Squarepoint, refused to turn the strategy over to Squarepoint when he resigned, and then took it to his new employer . . . [Millennium]." *Id.* at 1–2.

1

**B.**  **Arbitration and District Court Proceedings**

In April 2018, Squarepoint commenced a civil proceeding in the United States District Court for the Southern District of New York (the "District Court") and arbitration proceedings against Sesum.  ECF No. 33 at 4.

### i.    Request for a Preliminary Injunction

Squarepoint first filed a Petition for a Preliminary Injunction Pending the Arbitration in the District Court.  *Squarepoint Ops, LLC v. Vojislav Sesum*, Case No. 18-cv-03524 (S.D.N.Y. 2018) ("2018 Proceeding").  In May 2018, Judge Analisa Torres entered an order denying Squarepoint's request for a preliminary injunction and dismissing the action.  2018 Proceeding at ECF Nos. 11, 15, 21, 25, 26.

### ii.    Initial Arbitration Award

In February 2019, Squarepoint and Sesum participated in a four-day arbitration administered by the American Arbitration Association (the "Arbitration").  J-43.  The Parties submitted post-arbitration briefing and delivered closing arguments in June 2019.  In July 2019, the arbitrator issued a 39-page Final Award in favor of Squarepoint (the "Initial Arbitration Award").  J-43, Final Award at 1–39.  In its decision, the arbitrator made three key findings.  First, the arbitrator found that Sesum's actions were in breach of his duty of loyalty owed to Squarepoint, awarding Squarepoint damages totaling $188,136.87.  *Id.* at 30.  Second, the arbitrator ordered the disgorgement of profits made by Sesum through his use of the Strategy,[1] which the arbitrator calculated to be $919,052.78.  *Id.* at 13, 33–34.  Third, the arbitrator ordered injunctive relief against Sesum (the "Injunction"), which required Sesum to (i) return the underlying code and backtests to Squarepoint, (ii) inform Millennium that he did not own the Pre-Employment Intellectual Property, (iii) cease use of the Strategy and pay Squarepoint any profits he was paid by Millennium, and (iv) inform Millennium of the injunctive relief.  *Id.* at 36–37.

---

[1] The Court notes that this term is defined in the Initial Arbitration Award as the strategy proposed by Sesum in the survey.  J-43, Final Award at 8.  The Court reviewed the survey and it is unclear as to what strategy was being proposed by Sesum.

### iii.    2019 District Court Proceeding

On August 6, 2019, Squarepoint filed a Petition to Confirm the Initial Arbitration Award (the "Petition for Confirmation") in the District Court.  *Squarepoint Ops, LLC v. Vojislav Sesum*, Case No. 19-cv-07317 (S.D.N.Y. 2019) ("2019 Proceeding").  On September 13, 2019, Sesum filed a Motion to Vacate the Initial Arbitration Award (the "Motion to Vacate") and a Memorandum of Law in Support of its Motion to Vacate.  2019 Proceeding at ECF Nos. 15, 16.  Squarepoint filed its opposition to the Motion to Vacate on September 30, 2019, and Sesum filed its reply to the opposition on October 15, 2019.  *Id.* at ECF Nos. 23, 28.  In March 2020, Judge Loretta A. Preska granted and denied in part both Squarepoint's Petition for Confirmation and Sesum's Motion to Vacate (the "March Order").  *Id.* at ECF No. 32.  Judge Preska remanded the Initial Arbitration Award to the arbitrator for clarification related to the injunctive relief portion of the award.  *Id.*

### iv.    Modified Arbitration Award

In response to Judge Preska's March Order, the arbitrator issued a Modified Final Award on May 21, 2020 (collectively, with the Initial Arbitration Award, the "Arbitration Award"), clarifying the scope of the injunctive relief. J-43, Modified Final Award at 1–7. In the Arbitration Award, the arbitrator clarified the scope of the Injunction. *Id.* at 4 n.2. The arbitrator clarified that the "scope of the injunction applies to what Sesum cannot do directly or indirectly." *Id.* The arbitrator also pointed to the exhibits which it found describe the "intellectual property" that is the subject of the Injunction. *Id.* The arbitrator indicated that the "intellectual property" is described in the Portfolio Management Survey and Finance Manager Agreement, both prepared by Sesum, as well as notes prepared by Millennium during their interview of Sesum. *Id.*

## II.    ADVERSARY PROCEEDING

In March 2020, Sesum filed a petition in the United States Bankruptcy Court for the Southern District of New York (the "Court") seeking relief under Chapter 7 of the United States Bankruptcy Code (the "Bankruptcy Code"). *In re Vojislav Sesum*, No. 20-10794 (Bankr. S.D.N.Y. 2020) ("Main Case"). Squarepoint then initiated an adversary proceeding (the "Adversary Proceeding") by filing a complaint (the "Complaint") seeking a determination that the debt owed to Squarepoint under the Arbitration Award is non-dischargeable pursuant to sections 523(a)(4) and/or 523(a)(6) of the Bankruptcy Code. ECF No. 1. On July 6, 2020, Sesum filed its answer to

the Complaint.  ECF No. 5.

In September 2020, the Court granted Squarepoint's Motion to Confirm the Arbitration Award.  Main Case at ECF No. 35.

### A.  <u>Motion for Summary Judgment</u>

Discovery was completed in March 2021.  ECF No. 23.  In June 2021, Plaintiff filed a motion for summary judgment (the "<u>Summary Judgment Motion</u>"), a statement of facts, and a declaration in support of the Summary Judgment Motion.  ECF Nos. 23, 25, 26.  Squarepoint sought a declaration that the Arbitration Award is non-dischargeable pursuant to sections 523(a)(4) and/or 523(a)(6) due to "[Sesum's] willful and malicious misappropriation of Squarepoint's trade secrets."  ECF No. 26 at 1.  On August 18, 2021, Sesum filed a Memorandum of Law in Opposition to the Summary Judgment Motion and related documents.  ECF Nos. 28, 29, 31 at 2.  The Court heard oral arguments regarding the Summary Judgment Motion in September 2021.

In September 2022, the Court issued an Opinion and Order denying Squarepoint's Motion for Summary Judgment (the "<u>SJ Opinion</u>").  ECF No. 31.  The Court found that Squarepoint failed to prove the fraudulent intent necessary to support its argument that Sesum's actions amounted to embezzlement.  *Id.* at 5.  The Court also found that Squarepoint failed to provide sufficient evidence of willfulness as required under section 523(a)(6).  *Id.* at 6.

### B.  <u>Trial</u>

On February 6, 2023, the Court entered a Joint Pre-Trial Order outlining the two issues to be tried.  ECF No. 33.  First, "whether Sesum's conduct was undertaken with fraudulent intent such as to fall within the exception to discharge of 11 U.S.C. 523(a)(4) for embezzlement."  *Id.* at 7.  Second, "whether Sesum acted with the requisite willfulness to come within the exception to discharge of 11 U.S.C. 523(a)(6)."  *Id.*  The Defendant filed a declaration in lieu of direct testimony (the "<u>Declaration</u>").  ECF No. 34.  A two-day trial was held on February 28, 2023 and March 3, 2023 (the "<u>Trial</u>").[2]  ECF Nos. 35, 36.

At the Trial, it became clear that there are two additional issues that must be decided by this Court: whether there was embezzlement of property by Sesum, and, if the Court were to rule

---

[2] The Court notes that the testimony given at Trial indicates that there were a few errors in the factual findings as set forth in the Arbitration Award.  The Court has noted in this opinion where such errors are relevant.

4

in favor of the Defendant, clarification of the scope of the discharge of Squarepoint's claim. Specifically, the Court must decide whether there was property, as defined under New York state law, which was appropriated by the Debtor, and whether the Injunction is included as part of Squarepoint's claim for purposes of discharge.

### i.    Post-Trial Briefing

Following the Trial, the Court authorized supplemental briefing on two issues. ECF No. 36. First, whether the Strategy qualifies as property under applicable law, as required to establish embezzlement under section 523(a)(4). *Id.* at 124–26. Second, whether the Injunction constitutes a "claim" for purposes of discharge. *Id.* at 120–21.

On April 14, 2023, Sesum filed its supplemental briefs. ECF Nos. 37, 38. On May 15, 2023, Squarepoint filed its responses to Sesum's supplemental briefs. ECF Nos. 39, 40.

## III.    DISCUSSION

There are four issues before the Court. The first two issues relate to dischargeability under section 523(a)(4): (1) whether the Strategy is property under New York state law, and (2) whether Sesum's conduct was undertaken with fraudulent intent as is required for embezzlement under section 523(a)(4). The third issue relates to dischargeability under section 523(a)(6) and considers whether Sesum acted with the requisite willfulness. The fourth issue is whether the Injunction constitutes a dischargeable claim.

### A.    <u>Dischargeability Under Section 523(A)(4)</u>

First, the Court will determine whether Squarepoint's debt, which is based upon the Arbitration Award, falls within the exception to discharge of section 523(a)(4) of the Bankruptcy Code for embezzlement.

The Bankruptcy Code provides several exceptions to the dischargeability of debts. *See* 11 U.S.C. § 523(a). Pursuant to section 523(a)(4), "[a] discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (4) for fraud or defalcation while acting in a fiduciary capacity, ***embezzlement***, or larceny[.]" 11 U.S.C. § 523(a)(4) (emphasis added).

Federal common law defines embezzlement as the "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Bevilacqua*, 53 B.R. 331, 333 (Bankr. S.D.N.Y. 1985) (citations omitted). To successfully plead that a claim is non-dischargeable under section 523(a)(4) due to embezzlement, a creditor must prove: "(1) that the creditor entrusted his property to the debtor; (2) that the debtor appropriated the property for a purpose other than that for which it was entrusted; and (3) the circumstances indicate that the debtor acted with fraudulent intent or deceit." *In re Nappy*, 269 B.R. 277, 296–97 (Bankr. E.D.N.Y. 1999).

### i.    Property Requirement

Elements one and two of embezzlement require the existence of property. Courts in the Second Circuit look to state law when determining what constitutes property for purposes of an embezzlement claim. *See Gasson v. Premier Cap., LLC*, 43 F.4th 37, 41–42 (2d Cir. 2022). The law applicable here is New York law.[3]

Under New York law, intangible property with any similarity to its physical counterpart is considered property. *See Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292–93 (N.Y. 2007) (finding that data on an electronic system containing plaintiff's personal data satisfied the definition of property because the data was "indistinguishable" from the physical documents containing the same information); *Spa World Corp. v. Lipschik*, No. 09-CV-1711, 2010 WL 11632681, at *7, 17 (E.D.N.Y. Sept. 9, 2010) (holding that customer documents and records that could be deleted from a computer system are property under New York state law); *Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16 Civ. 2555, 2017 WL 239379, at *4 (S.D.N.Y. Jan. 18, 2017) (finding an exception to the rule that intangible property alone is insufficient to satisfy the definition of property where the rightful owner of the intangible property is prevented from creating or enjoying a legally recognizable and protectable property interest in his idea). New York courts have been clear that the intangible property must have some tangible form to be considered property, and mere ideas and expressions alone will not be enough. *People v. Aleynikov*, 31 N.Y.3d 383, 403 (N.Y. 2018) (holding that a source code was property when copied

---

[3] The Court notes that, in its filing, the Plaintiff cites to numerous cases where courts in other jurisdictions, applying other state law, held that intellectual property, including trade secrets, was property for purposes of an embezzlement claim. ECF No. 39 at 2–3. The Court finds those cases to be inapplicable.

onto a physical medium such as a hard drive); *Kraus USA, Inc. v. Magarik*, No. 17-CV-6541, 2020 WL 2415670, at \*11 (S.D.N.Y. May 12, 2020) (holding that trade secrets stored electronically "but likely shared in some tangible, documentary form" are property for purposes of a conversion claim); *Rushing v. Nexpress Sols., Inc.*, No. 05-CV-6243, 2009 WL 104199, at \*6 (W.D.N.Y. Jan. 14, 2009) (holding that a tangible patentable idea without a tangible counterpart is not property for purposes of a conversion claim); *Yankowitz Law Firm v. Tashlitsky (In re Tashlitsky)*, 492 B.R. 640, 649 (E.D.N.Y. 2013) (finding that an interest or expectancy in potential business opportunities does not qualify as property under the embezzlement exception to discharge of section 523(a)(4)).

Generally, under New York law, trade secrets are treated as intangible property. *Tate & Lyle Ingredients Am., Inc. v. Whitefox Tech. USA, Inc.*, No. 6000070/2009E, 2011 WL 11414185, at \*20–21 (Sup. Ct. N.Y. Cnty. Apr. 11, 2011) (holding that "any claim for conversion of intangible property such as trade secrets would be dismissed" on the grounds that "the subject matter of a conversion action must be tangible personal property"). Trade secrets may only satisfy the definition of property when the trade secret is in tangible form, and reaching such conclusion is a fact-specific inquiry. *Kraus USA, Inc.*, 2020 WL 2415670, at \*11 (pointing to the "technical product specifications, information on upcoming designs, sales data, e-commerce know-how and data, customer lists, vendor relationships, the identity of contractual counterparties, and internal cost structure and operating expenses" when finding that the trade secrets "were stored on the computer but likely shared in some tangible, documentary form" sufficient for a conversion claim); *see also BCRS1, LLC v. Unger*, No. 20-cv-4246, 2021 WL 3667094, at \*9 (E.D.N.Y. Aug. 18, 2021) ("Applying [a] fact-specific framework" to determine whether a specific piece of intellectual property constitutes "'an electronic record of an intangible interest,' which is actionable" or "'the intangible interest itself,' which is not actionable").

The Plaintiff argues that the Strategy is intangible property with the physical elements necessary to satisfy the definition of property. ECF No. 39 at 6–9. The Plaintiff cites to the arbitrator's findings and the exhibits presented at the Arbitration as evidence in support of its position. *Id.* The Plaintiff points to the arbitrator's finding that the Strategy and code had to be "written and installed" on Squarepoint's system to support its argument that the Strategy and code behind the backtests have a physical counterpart. *Id.*

Plaintiff is seeking non-dischargeability of its debt and therefore has the burden of proof as to whether the intangible property has physical elements. *See In re Bevilacqua*, 53 B.R. 331, 333 (Bankr. S.D.N.Y. 1985) ("A party asserting the nondischargeability of a debt has the burden of proving each element by clear and convincing evidence.") (internal citations omitted). The evidence presented at Trial by the Plaintiff did not include any physical evidence of the Strategy or the code's existence on Squarepoint's system. Ex. D-8Q at 426:20–427:8. Although Squarepoint points to a variety of sources, including a survey completed by Sesum, interview notes from Sesum's interview with Millennium, notes in Sesum's notebook, and missing notebook pages to support the arbitrator's finding of a Strategy, this is insufficient evidence to show where the Strategy[4] originated and where it is or was previously located. The fact that the arbitrator found that the Strategy was a trade secret in the Arbitration Award does not make the Strategy property under New York law. J-43, Final Award at 35 (finding that "Squarepoint established that the Strategy constitutes a trade secret within the meaning of DTSA, as well as under New York common law . . . .").

Cases in this circuit, applying New York law, have made it clear that for intangible property to constitute property for a claim of embezzlement, the intangible property must have some tangible form. This requirement similarly applies to trade secrets. Thus, where trade secrets are at issue, they will only satisfy the definition of property if they are reproduced in a tangible form. An idea or intellectual property with no tangible counterpart is not enough, and that is precisely what the evidence here demonstrates.

The Defendant asserts in his Declaration that he left Squarepoint with nothing more than the "ideas, concepts and knowledge stored only in [his] brain." ECF No. 34 at ¶ 26. In support of this statement, the Defendant testified that he did not take, forward, or copy any of Squarepoint's confidential information or data. ECF No. 34 at ¶¶ 23–25, 28. As discussed above, the evidence presented by the Plaintiff did not prove the existence of intangible property or trade secrets with a physical or electronic form.

---

[4] The arbitrator appears to have assumed that the strategy employed by Sesum at Millennium is the same as the strategy employed by Sesum in the two backtests. The evidence presented at Trial demonstrates that it was not the same strategy. ECF No. 34 at ¶ 30; ECF No. 35 at 160:13–163:15.

For these reasons, the evidence presented at Trial fails to support a finding that the Strategy is property under New York law.

### ii.    Appropriation

The second element of a claim of embezzlement requires a finding that the property was appropriated for a purpose other than that for which it was entrusted. *See In re Nappy*, 269 B.R. 277, 296–97 (Bankr. E.D.N.Y. 1999). As discussed above, the finding of property is essential to satisfying both the first and second element of a claim of embezzlement. The arbitrator found that Sesum "[took] Squarepoint's intellectual property and trade secrets and [gave] Millennium a license to use such[.]" J-43, Final Award at 36. This finding may satisfy a finding that an appropriation took place; yet, as discussed above, the evidence presented at Trial does not support a finding of property. *See supra* Section III.A.i.

For these reasons, the second element of the embezzlement claim is not satisfied.

### iii.    Fraudulent Intent

The third element of an embezzlement claim requires a finding that the debtor acted with fraudulent intent or intent to defraud. *See In re Nappy*, 269 B.R. at 296–97; *see also In re Marashi*, No. 17 CV 10122, 2019 WL 120726, at *2 (S.D.N.Y. Jan. 7, 2019) ("Conversion on its own, absent an intent to defraud, does not constitute embezzlement under this provision.") (citations omitted); *Forest Diamonds Inc. v. Aminov Diamonds LLC*, No. 06 Civ. 5982, 2010 WL 148615, at *14 (S.D.N.Y. Jan. 14, 2010); *In re Gabor*, No. 06-01916, 2009 WL 3233907, at *6 (Bankr. S.D.N.Y. Oct. 8, 2009).

Courts indicate that fraudulent intent may be determined from the facts and circumstances surrounding the act. *See In re Veneziano*, 615 B.R. 666, 678 (Bankr. D. Conn. 2020) (holding that the facts underlying a finding of embezzlement under relevant state law demonstrated the requisite intent for the wrongful taking of property from its rightful owners where defendant, as financial head of the plaintiff, had been entrusted with corporate funds, wrongfully converted a substantial amount of corporate funds for his own use, and had demonstrated a record of looting the corporate treasury in substantial amounts for his own benefit over a period of at least ten years); *In re Suarez*, No. 95 CV 5038, 1996 WL 480809, at *4 (E.D.N.Y. Aug. 9, 1996) (holding that fraudulent intent could be inferred from circumstantial evidence where the debtor testified that despite receiving

regular statements indicating the balance of his retirement account, he did not know the balance of his retirement account after depositing a check from a retirement plan and trust of his former employer that constituted an overpayment of over $87,000, and subsequently failed to return the overpayment upon the request of said trust); *In re Bevilacqua*, 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985) (holding that the debtor had, with "no doubt," misappropriated funds where he, acting as the agent of a certain check holder, deposited said check in a corporate account belonging to a corporation of which the debtor was the president and, after waiting about a month, mailed the principal a "bad check" that was drawn on a then-closed corporate account); *In re Nappy*, 269 B.R. at 298 (holding that the debtor broker-dealer president's use of "multiple layers of accounts [and] transactions" to deposit customer funds into his personal account was "clear evidence of [the debtor's] intent to perpetrate his fraudulent scheme with customer funds").

While the Court previously found that the evidence supports a finding that the Defendant engaged in deceit vis-a-vis Squarepoint, fraudulent intent is necessary to satisfy the third element of an embezzlement claim. ECF No. 31 at 4. In weighing all of the evidence presented to the Court at Trial, there is insufficient evidence to support a finding of fraudulent intent.

The Plaintiff points to the Defendant's actions and behavior prior to his resignation from Squarepoint to prove that he acted with fraudulent intent. ECF No. 36 at 56:8–57:10, 65:19–24, 66:23–67:23, 82:15–83:13. The evidence supporting a finding of fraudulent intent includes the arbitrator's finding that the Defendant had a plan based on the final notebook that the arbitrator reviewed. J-43, Final Award at 6. When the Defendant left Squarepoint, the Defendant did not tell Charles Caverne, his manager at Squarepoint, about the backtests and did not have a good reason for not doing so. ECF No. 35 at 109:3–110:3; ECF No. 35 at 110:11–16. Moreover, the Defendant did not provide Mr. Caverne with any information about where the code for the backtests is located on Squarepoint's computer. ECF No. 35 at 127:17–128:8. To date, Squarepoint has been unable to locate the code for the backtests on its computer system. Ex. D-8Q at 426:20–427:8.

The arbitrator also made several findings related to the deletion of files from both Squarepoint's system and the Defendant's notebooks, which if proven, may have supported a finding of fraudulent intent. J-43, Final Award at 26. The arbitrator highlighted the Defendant's internet searches to learn how to copy and delete materials. *Id.* In his Declaration, Sesum testified

that "[o]n a number of occasions while at Squarepoint, the quantitative analysts and other employees were advised that certain servers were at close to capacity and that we should delete electronic files to the extent possible. Based on those directives, I would periodically delete electronic files which were not necessary or helpful to my work." ECF No. 34 at ¶ 21; *see also* J-44. Critically, there is no evidence showing that the Defendant actually copied or deleted any code or backtests from Squarepoint's system based on Mr. Caverne's testimony at the Arbitration. *See* D-8N at 371:13–23; *see also* D-8W at 491:7–12. The arbitrator also pointed out that Defendant's notebooks were missing several pages. J-43, Final Award at 26. It was inferred from this finding that the missing pages may have contained code or proprietary information belonging to Squarepoint, but there is no proof of what in fact was written on those missing pages or that Defendant ultimately took those missing pages. *Id.*; *see generally* ECF No. 34 at ¶¶ 28, 36; ECF No. 35 at 71:10–14.

The arbitrator concluded that Sesum had a plan based on a notebook entry dated January 29, 2018. J-43, Final Award at 6–7. However, the arbitrator never questioned the Defendant at the Arbitration about this notebook entry. In response to this conclusion, the Defendant testified in his Declaration: "That is a clearly erroneous interpretation of my notes from January 29, 2018. In fact, they reflected a reminder to do precisely what Charles Caverne had asked me to do in an email transmitted on Friday, January 26 (which to my understanding will be submitted as an exhibit in this proceeding). The subject of that email was a project involving rolling calibration for certain earnings strategies; Mr. Caverne asked me to 'start working on a q script doing the rolling calibration,' and provided instruction (or a "model") of how to do that. I replicated the model, wrote a script that 'loads,' and advised him by email transmitted on February 3, 2018 that 'to run the analysis, you need to load /pxfs / dev/ sesumvoj/ tmp/ ben_earnings / code / rolling _analysis.q,' and that to change the 'feature selection,' he would need 'to load pvalue:: X, where X is the level of significance that you want.' I have no doubt that my January 29 'To Do' note referred to that assignment, and not the purpose ascribed by the Arbitrator. Had I been questioned about it, or been aware that she intended to review the notebooks for content and seize upon that entry, I would have directed her to Mr. Caverne's assignment of January 26 and testified truthfully that the note reflected precisely that assignment." ECF No. 34 at ¶ 34(a); J-54; J-56; *see* ECF No. 35 at 76:8–17. The Defendant's testimony provides a different explanation from the conclusion reached by the arbitrator.

11

Another piece of evidence that could potentially support a finding of fraudulent intent is the Defendant's behavior at his exit interview. ECF No. 35 at 110:11–16, 127:15–16. The Defendant was quite uncooperative at his exit interview. *Id.* His explanation for why he was so uncooperative at his exit interview was that the Defendant was afraid Squarepoint would do something that would cause him to lose his job at Millennium. *Id.* at 110:15–112:8. The Court did not find that explanation to be entirely credible.

Notwithstanding the arbitrator's findings with respect to the Defendant's actions prior to leaving Squarepoint, Sesum's failure to tell Mr. Caverne about the backtests, and Sesum's behavior at the exit interview, the evidentiary record as a whole does not prove the Defendant had fraudulent intent. As discussed below, the evidence proves the Defendant had an economic reason for leaving Squarepoint. This appeared to be his main motivation.

For these reasons, the third element of the embezzlement claim is not satisfied. Thus, Squarepoint's debt which is based upon the Arbitration Award does not fall within the exception to discharge of section 523(a)(4) of the Bankruptcy Code.

### B. Dischargeability Under Section 523(A)(6)

Squarepoint asserts that the Arbitration Award falls within the exception to discharge of section 523(a)(6) of the Bankruptcy Code. Section 523(a)(6) provides that: "(a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (6) for ***willful and malicious injury*** by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6) (emphasis added).

The Plaintiff must establish that: (1) the debtor acted willfully; (2) the debtor acted maliciously; and (3) the debtor's willful and malicious actions caused injury to the plaintiff or the plaintiff's property. *In re Soliman*, 539 B.R. 692, 698–700 (Bankr. S.D.N.Y. 2015). "The terms 'willful' and 'malicious' are separate elements, and both elements must be satisfied." *Id.* at 698 (quoting *In re Greene*, 397 B.R. 688, 693 (Bankr. S.D.N.Y. 2008); *In re Krautheimer*, 241 B.R. 330, 340 (Bankr. S.D.N.Y. 1999). The Court determined that the malicious element was satisfied in the SJ Opinion. ECF No. 31 at 6.

In order for a debt to be non-dischargeable under section 523(a)(6), "the injury caused must have been willful." *Salim v. VW Credit, Inc.*, 577 B.R. 615, 624 (E.D.N.Y. 2017) (citing

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998)).  In opining on the scope of section 523(a)(6), the Supreme Court of the United States held that the term "'willful' . . . modifies the word 'injury,' indicating that nondischargeability [requires] a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Geiger*, 523 U.S. at 61–62.  Therefore, "recklessly or negligently inflicted injuries" do not constitute willful injuries.  *Geiger*, 523 U.S at 64; *compare In re Fragala*, 645 B.R. 488, 499 (Bankr. E.D.N.Y. 2022) (holding that the plaintiff could not establish that the defendant's actions were willful where the evidence only alleged why defendant failed to pay plaintiff for services performed but did not establish that defendant's nonpayment was intended), *with In re Smallwood*, No. 20-01108, 2021 WL 4465560, at *12 (Bankr. E.D.N.Y. Sept. 28, 2021) (holding as part of its ruling related to claims for tortious interference with respect to business relationships, lost profits, and lost business opportunity, that plaintiff was entitled to summary judgment excepting his claim from defendant's discharge under section 523(a)(6) in part because a state court had "necessarily decided that [the defendant] willfully injured the [p]laintiff," by taking the plaintiff's merchandise and selling it at a below-market price).

An injury is willful where the actor "knows that the consequences are certain, or substantially certain, to result from his act."  *In re Fragala*, 645 B.R. at 499; *see also Geiger*, 523 U.S at 61–62 (drawing on the Restatement (Second) of Torts (1964) §8A, the court held that the "formulation of [section 523(a)(6)] triggers in the lawyer's mind the category of 'intentional torts,' as distinguished from negligent or reckless torts . . . [which] generally require that the actor intend[ed] 'the *consequences* of an act'" rather than just the act itself).

There persists a "long-standing" split amongst the circuit courts as to whether this "substantial certainty" test should be judged objectively or subjectively.  *See In re Margulies*, 517 B.R. 441, 452 (S.D.N.Y. 2014); *compare Matter of Scarbrough*, 836 F.3d 447, 453–54 ("The willful and malicious injury that occurred here is evidenced by both [i] an objective substantial certainty of harm and [ii] a subjective motive to cause harm."), *with In re Ormsby*, 591 F.3d 1199, 1206 (9th Cir. 2010) ("In [the 9th Circuit], § 523(a)(6)'s willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct.") (quotations omitted).

Although the Second Circuit has yet to opine on this issue, courts within this circuit have largely applied a subjective standard to the willfulness requirement.  *In re Margulies*, 566 B.R.

13

318, 330 (S.D.N.Y. 2017) (affirming the court's prior 2014 decision in the same case). For example, in *In re Margulies*, the District Court joined a line of prior decisions by this Court, endorsing the subjective standard. 517 B.R. at 453. The District Court reasoned that this standard "accords better" with the Supreme Court's decision in *Geiger*, which held that non-dischargeability requires a deliberate or intentional injury. *Id.* The Court added that application of a subjective standard is in line with "the [] Code's focus on intentional conduct by the debtor," as opposed to an objective standard, which focuses on an "objective observer's understanding of whether the injury was substantially certain" and is reminiscent of a recklessness standard. *Id.*; *see also In re Alicea*, 230 B.R. 492, 507 (Bankr. S.D.N.Y. 1999) ("'Willful' . . . means 'a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury,' and includes conduct that the actor is substantially certain will cause injury.") (internal citations omitted).

The Defendant testified at the Trial that he was approached by various recruiters with employment opportunities which is why he decided to look for a new job. ECF No. 35 at 158:7–19. The Defendant testified that he was interested in working at Millennium because it is "one of the largest hedge funds" and it offered him "a fair amount of autonomy in [his] work." *Id.* at 158:20–23. The Defendant also testified that the "money that Millennium was offering was substantial." *Id.* at 159:3–5.

This contradicts the Plaintiff's argument that Sesum planned to leave for Millennium early on in his time at Squarepoint. The Plaintiff points to the Defendant's unsuccessful prior interview with Millennium and certain of the Defendant's actions while at Squarepoint that the arbitrator found in the Arbitration Award. Specifically, the arbitrator found that "Sesum hid his work on the Strategy by naming folders in a manner that disguised their contents[,]" that "[h]e failed to deliver the code, algorithms, and other back-up to the Strategy to Squarepoint," and that he "deleted materials from the notebooks . . . and from the Squarepoint computers." J-43, Final Award at 25–26.

Both sides agree that Sesum ran certain backtests in November 2017 and January 2018. ECF No. 35 at 98:15–20. Both sides agree that the backtests showed positive P & L. *Id.* at 100:8–11. The Plaintiff did not disagree that the strategy in the backtests was a post-earnings, events driven strategy. ECF No. 34 at ¶ 22.

14

In his Declaration, the Defendant testified that he did not delete the backtests ran in November 2017 and January 2018. *Id.* at ¶ 23. The Defendant testified that he did not forward or copy the backtest results or any portion of them. *Id.* at ¶ 24. Nor did he photograph or otherwise attempt to image the backtest results or the code underlying the backtests. *Id.* at ¶ 25. The Defendant's testimony is that the only information that he took when leaving Squarepoint "were the ideas, concepts and knowledge stored only in [his] brain." *Id.* at ¶ 26. He also testified at Trial that he did not delete the backtests from Squarepoint's computer, did not copy the backtests, and did not photograph the backtest results or code. ECF No. 35 at 102:14–103:25. The Defendant testified that the backtests were "variations of a post-earnings, events-driven trading idea on which [he] had been working." ECF No. 34 at ¶ 22. However, the Defendant explained that the strategy that he developed at Millennium differed from the strategy employed in the backtests: "Among other things: (i) the strategy [he] developed and implemented at Millennium was based upon several different corporate events, not just earnings, whereas the idea and code underlying the Backtests was based upon earnings only; (ii) to the extent the trading strategy implemented at Millennium was based on earnings, it considered both pre and post-earnings data. . .; (iii) the trading strategy implemented at Millennium employed a different method of portfolio and hedging construction than the idea and code underlying the Backtests; and (iv) the trading strategy implemented at Millennium it was subject to different sizing and limits than the idea and code underlying the Backtests." *Id.* at ¶ 30.

This is corroborated by the recollection of Parakosh Singh, Millennium's Vice President of Business Development, of Sesum's job interview. Mr. Singh recalled Sesum discussing various strategies and not just one strategy. Ex. D-8GG at 817:2–10. Additionally, Mr. Singh's testimony at the Arbitration demonstrated that he was aware that Sesum was not a portfolio manager at Squarepoint and he was taking a risk by hiring him. Ex. D-8FF at 779:10–781:9, 785:4–786:16; Ex. D-8GG at 827:20–828:7.

The Plaintiff alleges that the Defendant intended to harm Squarepoint and had a plan to do so. In support of this argument, the Plaintiff relies in part on the arbitrator's aforementioned findings in the Arbitration Award and in part on other facts. However, the arbitrator appears to have made several mistakes in the Arbitration Award findings. One example is the arbitrator's statement that the language in the final notebook is evidence that the Defendant had a plan, as discussed above. *See supra* at III.A.iii. Additionally, the testimony shows that the Defendant ran

15

many backtests as part of his job, so that does not appear to be suspicious.  ECF No. 34 at ¶ 18.

The evidence also demonstrates that the strategy used at Millennium was not identical to the strategy for the backtests.  ECF No. 34 at ¶ 30.  The arbitrator's finding that the strategy for the backtests was the strategy that the Defendant employed at Millennium appears to be incorrect. J-43, Final Award at 27.

The injury that the Plaintiff alleges was inflicted on it by the Defendant is that the Defendant deliberately absconded with the strategy of the backtests with the intent to harm Squarepoint and brought the strategy to Millennium, who implemented it for financial returns. The evidence from Trial does not prove that the Defendant had an intent to harm the Plaintiff; rather, the facts seem to show an intent to be promoted and make more money.  The evidence from the Trial does not prove that the Defendant absconded with any property of the Plaintiff.  Nor does the evidence from the Trial prove that the strategy (which is the basis for the two referenced backtests) is the same strategy which was implemented at Millennium.  Accordingly, the Court does not find that the Defendant's behavior was willful.

For these reasons, Squarepoint's debt which is based upon the Arbitration Award does not fall within the exception to discharge of section 523(a)(6) of the Bankruptcy Code.

**C.  <u>Injunction as a Claim</u>**

Fourth, the Court will address whether the Injunction constitutes a claim pursuant to section 101(5)(B) of the Bankruptcy Code and therefore is subject to discharge under section 727(b) of the Bankruptcy Code.  The issue was raised at the Trial and the parties were asked to submit post-trial briefing on the issue.  *See* ECF No. 36 at 120–21; ECF Nos. 37, 40.

**i.  Dischargeable Claim**

Section 101(5)(B) of the Bankruptcy Code defines a "claim" as "[a] right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."  11 U.S.C. § 101(5)(B).  In determining what constitutes a claim, "Congress unquestionably expected [the] definition [of claim] to have wide scope."  *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d. Cir. 1991); *see also In re Raymond*, 129 B.R. 354, 359 (Bankr. S.D.N.Y. 1991) ("The legislative history of the Bankruptcy Code evidences

16

Congress' desire to provide the broadest possible definition of 'claim' when it enacted Code § 101(5).") (internal quotations omitted).

Any pre-petition debt that falls within the definition of "claim" under section 101(5) is dischargeable in a bankruptcy proceeding under section 727(b).  11 U.S.C. § 727(b).  Section 727(b) states that "[e]xcept as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a *claim* that is determined under section 502 of this title as if such *claim* had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a *claim* based on any such debt or liability is allowed under section 502 of this title." *Id.* (emphasis added).

### a.    Right to Payment

The Supreme Court of the United States and courts within the Second Circuit have both considered whether an injunction constitutes a debt or liability that falls within the definition of a claim.  *See generally Ohio v. Kovacs*, 469 U.S. 274 (1985); *see also In re Chateaugay Corp*., 944 F.2d at 1003.  The determination as to whether injunctive relief satisfies the definition of a claim dischargeable in bankruptcy under section 727(b) turns on whether the injunctive relief equates to a right to payment.

In *Ohio v. Kovacs*, the Supreme Court of the United States considered whether an injunction ordering the respondent to cleanup a hazardous waste site constituted a dischargeable claim.  469 U.S. at 284.  A receiver had been appointed to complete the cleanup on respondent's behalf, yet it failed to complete its tasks before the time the respondent filed for bankruptcy.  *Id.* The receiver then sought a monetary payment to complete its responsibilities.  *Id.*  The Supreme Court agreed with the appellate court in finding that since the receiver was now seeking a monetary payment, the injunction was a dischargeable claim.  *Id.* at 277, 283–84.

The Second Circuit also determined that injunctive relief constituting a right to payment is a dischargeable claim.  In its 1991 decision *In re Chateaugay Corp*., the Second Circuit ruled that where "[a]n injunction does no more than impose an obligation entirely as an alternative to a payment right[,]" it satisfies the claim definition and is dischargeable.  944 F.2d at 1008.  To the contrary, where the injunction does not seek to impose a right to payment but instead requires the

17

party to partake in certain behavior, then it is not a claim and therefore non-dischargeable.  *Id.*

Applying the analysis in *Kovacs* and *In re Chateaugay Corp.*, this Court in *In re Mark IV Industries, Inc.* held that an injunction requiring the debtor to cleanup a hazard site did not fall within the definition of claim.  438 B.R. 460 (Bankr. S.D.N.Y. 2010).  The Court explained that where the court dispossesses the debtor of the ability to comply with the obligations of an injunction, and instead seeks only a right to payment, such as in *Kovacs*, then the obligations under the injunction amount to a dischargeable claim.  *Id.* at 467–68.  To the contrary, where the injunction imposes only a duty on the debtor to stop from engaging in certain behavior, such as seizing ongoing pollution, or provides the debtor with the option to comply with its obligations under the injunction, such as providing access to the site to complete its required remediation duties, as was the case in *In re Mark IV Industries. Inc.*, then the obligations under the injunction do not satisfy the definition of a claim.  *Id.* at 468–69.

### ii.    Injunction Does Not Satisfy the Claim Definition

Courts within the Second Circuit find that where injunctive relief imposes a right to payment, the injunction satisfies the definition of "claim" pursuant to section 101(5).  The Defendant, citing to *Kovacs*, argues that the Injunction provides a "right to payment[] for the disgorgement of funds that the debtor would have [] received as a result of work on the strategy[,]" and therefore constitutes a dischargeable claim under the Bankruptcy Code.  ECF No. 36 at 118:8–20.  For the following reasons, the Court disagrees with the Defendant's position.

### a.    Absence of a Right to Payment

The Injunction fails to include a right to payment.  In the Arbitration Award, the arbitrator determined that the Strategy constitutes a trade secret under the DTSA, and Sesum violated the DTSA by "taking" the Strategy and "giving Millennium a license to use [the Strategy]."  J-43, Final Award at 36.  Based on these findings, the arbitrator determined that "there [was] no adequate remedy at law[]" and "permanent injunctive relief [would] prevent future harm."  *Id.*  The arbitrator noted that Squarepoint was not seeking damages based on Sesum's violation of the DTSA, and instead the Injunction provided what Sesum "cannot do directly or indirectly."  J-43, Modified Final Award at 4 n.2.

18

The Injunction outlines a set of restrictions on Sesum's use of the Strategy. One of the restrictions directs Sesum to "immediately cease using and divulging the Strategy" and to "disgorge and pay to Squarepoint any profits Millennium paid to Sesum . . . within 30 days [] or within 30 days of the receipt of such profits[.]" J-43, Final Award at 36. Pointing to this language, Sesum argues that a breach of the equitable remedy gives a rise to payment and therefore the Injunction constitutes a dischargeable claim. ECF No. 37 at 6.

In support of this position, the Defendant points to the facts in *Kovacs* and *In re Uchitel* to support a finding that the Injunction's language provides a right to payment. ECF No. 37 at 7–9. First, the Defendant argues that the facts in this case are analogous to those in *Kovacs* since a money judgment would result from a breach of the Injunction. *Id.* at 7. In *Kovacs*, the receiver was seeking a monetary payment to complete a cleanup. 469 U.S. at 283. The injunctive relief originally sought the completion of the cleanup by the respondent, but the relief became a monetary payment upon the bankruptcy filing, since the receiver sought the funds to finish the cleanup it was not able to complete prior to the filing. *Id.* The conversion of the injunctive relief to a right to payment made the injunctive relief a dischargeable claim. *Id.*

But the facts in *Kovacs* are not analogous to the facts in this case. The Plaintiff is not seeking a payment through the Injunction. Instead, the Injunction adds the potential for a damages claim if the Defendant fails to comply with the terms of the Injunction. J-43, Final Award at 36–37. The Injunction requires Sesum to "cease using and divulging the Strategy." *Id.* It is only upon a breach of the Injunction that a damages claim may arise. *Id.* There is a difference between injunctive relief that has been converted into only a claim for a monetary payment, as was the case in *Kovacs*, versus injunctive relief that is instead directing the debtor to stop certain activity with the risk of a damages payment if the debtor fails to oblige, as is the case here.

The Defendant also likened the Injunction to the injunctive relief initially sought in *In re Uchitel*. ECF No. 37 at 8–9. In *In re Uchitel*, the moving party originally sought enforcement of an arbitration award that included both monetary damages and injunctive relief. No. 20-11585, 2022 WL 3134217, at *11 (Bankr. S.D.N.Y. Aug. 4, 2022). The moving party conceded that the monetary damages were a dischargeable claim and amended the arbitration demand to seek only the injunctive relief. *Id.* at *9. The Defendant argues that the Injunction is similar to the original arbitration demand in *In re Uchitel* which sought both monetary damages and injunctive relief. *Id.*

The Injunction, unlike the original arbitration award in *In re Uchitel*, does not seek both monetary damages and injunctive relief. Instead, as correctly argued by the Plaintiff, any monetary damages available through the Injunction are in addition to the injunctive relief and not an alternative. ECF No. 40 at 4. For this reason, the facts in *In re Uchitel* also fail to support a finding here that the Injunction should be treated as a dischargeable claim.

Instead, this Court's decision in *In re Mark IV Industries, Inc.* is instructive in finding that the Injunction is not a claim. In its decision, this Court highlighted that where an injunction simply serves to impose a duty on the debtor to stop from engaging in certain behavior, or at least provides the debtor with the option to stop certain behavior instead of requiring the payment of damages, then the injunction does not qualify as a claim. 438 B.R. at 468–69.

Here, the Injunction imposes four affirmative duties, which include returning the underlying code and backtests to Squarepoint, informing Millennium that it did not own the Pre-Employment Intellectual Property, ceasing the use of the Strategy, and informing Millennium of the Injunction. J-43, Final Award at 36–37. None of the four obligations equate to a monetary payment. The third requirement, ceasing use of the Strategy, did require Sesum to pay Squarepoint any profits he was paid by Millennium. *Id.* The Court finds that any profits sought under this portion of the Injunction would have already been paid. In the Arbitration Award, the arbitrator ordered the disgorgement of "all profits [Sesum] has been paid by Millennium on the Strategy through the date of the Award," which the arbitrator calculated to be $919,052.78. *Id.* at 33–34. The Initial Arbitration Award was issued on July 3, 2019, and the Defendant indicates in his Declaration that he was suspended shortly after this date. *Id.* at 1–39; ECF No. 34 at ¶ 32. The Defendant was suspended with pay through his termination in September 2019, but to his knowledge, Millennium ceased using his work during the suspension period. ECF No. 34 at ¶¶ 32–33. Therefore, even though damages are awarded in the Arbitration Award,[5] the Injunction itself is devoid of any monetary damages.

---

[5] A finding that the Injunction does not provide for money damages and that the arbitrator relied on other claims to award damages is supported by the arbitrator's statement that damages were awarded **solely** for the breach of contract and faithless servant claim. *See* J-43, Final Award at 36 (emphasis added).

For these reasons, the Injunction does not satisfy the definition of a claim under section 101(5)(B) of the Bankruptcy Code and it is therefore not dischargeable.

### iii.    District Court

For the reasons set forth, the Court finds that the Injunction does not constitute a claim pursuant to section 101(5)(B) of the Bankruptcy Code, and therefore is not dischargeable under section 727(b) of the Bankruptcy Code.  To the extent that the Debtor seeks to vacate the Injunction set forth in the March Order and Arbitration Award, the District Court is the appropriate court from which to seek such relief.

## IV.    CONCLUSION

For the reasons set forth in this opinion, the Court finds that Squarepoint's monetary claim against the Debtor, which is based upon the Arbitration Award, is dischargeable.  Additionally, the Court finds that the Injunction does not constitute a claim and thus, is not discharged.

Dated: June 13, 2024
    New York, New York

*/s/ Lisa G. Beckerman*
**THE HONORABLE LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

21